UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KAREN POWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:17CV2017 HEA |
| ) | |
| NICHOLAS SHELTON, et al., ) | |
| ) | |
| Defendants. ) | |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment, [Doc. No. 77]. Plaintiff opposes the Motion, and Defendants have filed a reply. The matter is therefore ripe for adjudication.

**Facts and Background**

On August 19, 2014, Nicholas Shelton and Ellis Brown were police officers with the St. Louis Metropolitan Police Department ("SLMPD"). (Ex. D, Shelton Aff. ¶ 1; Ex. E, Brown Aff. ¶ 1). On that day, Officers Shelton and Brown were assigned to the 6th District in the City of St. Louis and were both in full police uniform. (Ex. D, Shelton Aff. ¶ 2; Ex. E, Brown Aff. ¶ 2). Officers Shelton and Brown were manning marked SLMPD police vehicle 805 and were utilizing call sign 1634. (Ex. D, Shelton Aff. ¶ 3; Ex. E, Brown Aff. ¶ 3). At approximately 12:20 p.m., Officer Shelton and Brown received a radio assignment for a

disturbance at the Six Star Market at 8701 Riverview near the intersection of Riverview and McLaran. The dispatcher advised that a tall black male wearing a blue hooded jacket and khaki pants was creating a disturbance and refusing to give back items he had apparently taken from the Six Star Market. (Ex. D, Shelton Aff. ¶ 4; Ex. E, Brown Aff. ¶ 4; Ex. A, Radio Transmission Recording 1). While en-route to the call, the dispatcher further advised the officers that, according to a second 911 caller, the same subject was walking back and forth in front of a barber shop with two knives –one in his right pocket and one in his hand.(Ex. D, Shelton Aff. ¶ 5; Ex. E, Brown Aff. ¶ 5; Ex. A, Radio Transmission Recording 2). When they arrived at the intersection of Riverview and McLaran, both saw a black male wearing khaki pants and a blue hooded jacket pacing back and forth on the sidewalk in front of a barber shop. (Ex. D, Shelton Aff. ¶ 6; Ex. E, Brown Aff. ¶ 6).

"Exhibit B" is a video recorded that day by a witness with a cell phone camera which fairly and accurately depicts the recorded events as they occurred on August 19, 2014. (Ex. D, Shelton Aff. ¶ 9; Ex. E, Brown Aff. ¶ 10; Ex. B). As the traffic signal turned green, Officer Brown drove the marked police vehicle past the subject's location at which time Officers Shelton and Brown both saw the subject staring at the police vehicle with his right hand inside his right front jacket pocket. (Ex. D, Shelton Aff. ¶ 10; Ex. E, Brown Aff. ¶ 13; Ex. B at 1:10-1:20).

As Officers Shelton and Brown came to the intersection of Riverview and Grape, Officer Brown made a u-turn towards the subject's location and curbed the marked police vehicle at a distance both believed to be approximately 30 feet north of the subject. (Ex. D, Shelton Aff. ¶ 12; Ex. E, Brown Aff. ¶ 14; Ex. B at 1:14-1:23).  The officers tactically positioned their vehicle pursuant to their training and experience to provide cover from potential gunfire.  (Ex. B at 1:37-1:40); (Ex. 1, Brown Depo 47:19-22).  As Officer Shelton exited the passenger side of the marked police vehicle, he ordered the subject, later identified as Kajieme Powell ("Powell"), to show his hands by repeatedly stating "get your hand out of your pocket." (Ex. D, Shelton Aff. ¶ 13; Ex. B at 1:25-1:29). Officer Brown also ordered Powell to take his hand out of his pocket. (Ex. E, Brown Aff. ¶ 16; Ex. B at 1:26-127). Both believing Powell was armed and both seeing that he had his right hand in his pocket, Officers Shelton and Brown drew their department-issued handguns. (Ex. D, Shelton Aff. ¶ 14; Ex. E, Brown Aff. ¶ 15; Ex. B at 1:26).

Powell then quickly moved towards Officers Shelton and Brown and pulled an approximately eight inch long knife out of his pocket. (Ex. D, Shelton Aff. ¶ 15; Ex. E, Brown Aff. ¶ 17; Ex. B at 1:29, showing a blade in Powell's hand). After pulling out the knife, Powell began quickly moving toward Officers Shelton and Brown while yelling "kill me," "shoot me." (Ex. D, Shelton Aff. ¶ 16; Ex. E, Brown Aff. ¶¶ 17, 18; Ex. B at 1:29-1:31). Both Officers Shelton and Brown

3

ordered Powell to drop the knife. (Ex. D, Shelton Aff. ¶ 17; Ex. E, Brown Aff. ¶ 19). Officers Shelton and Brown ordered Powell to drop the knife a combined six times. (Ex. D, Shelton Aff. ¶ 18; Ex. E, Brown Aff. ¶ 20; Ex. B at 1:30-1:39). Powell did not comply with the officers' orders and did not drop the knife. (Ex. D, Shelton Aff. ¶ 18; Ex. E, Brown Aff. ¶ 20). Powell yelled "shoot me now mother*****," stepped up on a concrete embankment, and quickly moved toward Officer Shelton while gripping the knife with the blade pointed toward his pinky finger ("overhand grip").(Ex. D, Shelton Aff. ¶ 19; Ex. E, Brown Aff. ¶ 21; Ex. B at 1:33-1:40).  Although Plaintiff characterizes Powell's arm movements as "swinging his hands naturally back and forth," Powell continued to hold the knife in an overhand grip.  Powell continued to advance toward Officer Shelton in what Officers Shelton and Brown both perceived as an aggressive manner and Powell did not drop the knife. (Ex. D, Shelton Aff. ¶ 20; Ex. E, Brown Aff. ¶ 22; Ex. B at 1:37-1:40). Officer Shelton perceived Powell to be extremely agitated and Officer Shelton believed Powell was going to stab him. (Ex. D, Shelton Aff. ¶ 22).  Officer Brown likewise believed Powell intended to stab Officer Shelton. (Ex. E, Brown Aff. ¶ 24). It was physically possible for the officers to move behind the police vehicle as Powell approached.  (Ex. 1, Brown Depo. 65:19-24).

    When Powell reached what Officer Brown believed was approximately six to eight feet away from Officer Shelton, he fired his department-issued handgun at

4

Powell. (Ex. E, Brown Aff. ¶ 25).  Officer Shelton, fearing for his life and believing Powell was going to stab him, also fired his department-issued handgun at Powell. (Ex. D, Shelton Aff. ¶ 23; Ex. B at 1:40-42). Powell continued to advance toward Officer Shelton with the knife still in his hand and Officers Shelton and Brown continued to fire until Powell fell to the ground at Officer Shelton's feet. (Ex. D, Shelton Aff. ¶ 24; Ex. E, Brown Aff. ¶ 26; Ex. B at 1:40-42). Powell continued to grasp the knife in his right hand until he released it onto his chest while he was on the ground. (Ex. D, Shelton Aff. ¶ 24; Ex. E, Brown Aff. ¶ 26; Ex. B at 1:50).

Officer Brown immediately contacted Emergency Medical Services as Officer Shelton removed the knife lying on Powell's chest and placed it in the parking lot behind him and out of Powell's reach. (Ex. D, Shelton Aff. ¶ 27; Ex. E, Brown Aff. ¶¶ 27, 28; Ex. B at 2:18-2:21).

The DNA profile obtained from the knife is consistent with the DNA of Kajieme Powell. (Ex. F, Preiter Aff. ¶ 12). Excluding an identical twin, Kajieme Powell is the source of the DNA detected from a swab of apparent blood on the handle of the knife recovered from the scene of the Incident. (Ex. F, Preiter Aff. ¶¶ 7, 12).

Plaintiff agrees that Powell had an elongated object in his right hand. (Ex. H, Pl.'s Dep. at 43-44; Ex. J Cell Phone Video Screenshot at 1:29; Ex. B at 1:29).

5

Plaintiff agrees that at the 40th Second in the Cell Phone Video, 1:14 on the Cell Phone Video, and 1:24 on the Cell Phone Video, Powell had his right hand in his pocket.(Ex. H, Pl.'s Dep. at 48; Ex. B at 0:40, 1:14, 1:24). Plaintiff agrees that Officers Shelton and Brown ordered Powell to get his hand out of his pocket multiple times while his hand was in his pocket. (Ex. H, Pl.'s Dep. at 51-52). Plaintiff agrees that an elongated object is visible in Powell's hand in the Cell Phone Video at 1:29.(Ex. H, Pl.'s Dep. at 52-53; Ex. B at 1:29; Ex. J Cell Phone Video Screenshot at 1:29).34.An elongated object is visible in Powell's hand in the Cell Phone Video at 1:29.(Ex. H, Pl.'s Dep. at 52-53; Ex. B at 1:29; Ex. J, Cell Phone Video Screenshot at 1:29; Ex. K, Additional Cell Phone Video Screenshot). Exhibit B to Defendants' Motion for Summary Judgment (the "Cell Phone Video") is identical to the video Plaintiff received shortly after this shooting in all respects. (Ex. H, Pl.'s Dep. 61-62; Ex. B at 1:29). Plaintiff has no reason to doubt that the blood on the knife recovered from the scene matched Powell's DNA. (Ex. H, Pl.'s Dep. at 67). The only "evidence" Plaintiff claims she has to support her allegation that Powell did not have a knife is that she does not "remember seeing an object in [Powell's] hand]" when she first watched the video.(Ex. H, Pl.'s Dep. at 71). Plaintiff agrees that the Cell Phone Video shows Officer Shelton reach down, apparently pick an object up off Powell's chest, and toss the object into the parking lot behind him. (Ex. H, Pl.'s Dep. at 77-78).

6

Plaintiff agrees that the video evidence could be consistent with Officer Shelton taking a knife from Powell and tossing it to where it was recovered. (Ex. H, Pl.'s Dep. at 78; Ex. I, Knife Photo at Scene; Ex. L, Scene Photo; Ex. B at 2:18-2:21).

The officers were equipped with tasers and both believe they were equipped with pepper spray on August 19, 2014. (Ex. 2, Shelton Depo 42:6-8).

City has not purchased any liability insurance policy to cover torts, personal injuries, or any other claims that do not arise from dangerous property conditions or the operation of motor vehicles. (Ex. G, Kistler Dec. ¶ 3).

## Discussion

Defendants move for Summary Judgment on Plaintiff's remaining claims.[1]

> "Summary judgment is appropriate if the evidence, viewed in the light most favorable to [Plaintiff] and giving him the benefit of all reasonable inferences, shows there is no genuine issue of material fact." *Morgan v. A.G. Edwards*, 486 F.3d 1034, 1039 (8th Cir. 2007). We avoid judging an officer's split-second decision (made with imperfect information) against one we would make with a complete record and the benefit of hindsight. *Plumhoff v. Rickard*, 572 U.S. 765, 775, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014).

*Goffin v. Ashcraft*, No. 18-1430, 2020 WL 6072839, at *2–3 (8th Cir. Oct. 15, 2020).

**Qualified Immunity**

---

[1] Counts II, III, V, and VI have been previously dismissed.

7

Cases involving the use of deadly force are analyzed under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

> An officer's actions are justified when they are "objectively reasonable in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Capps v. Olson*, 780 F.3d 879, 884 (8th Cir. 2015). An officer is justified in using lethal force when she "has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others." *Garner*, 471 U.S. at 11.

*Goffin*, No. 18-1430, 2020 WL 6072839, at *2–3.

Defendants Brown and Shelton are entitled to qualified immunity if their

> conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We do "not define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (citation omitted).

*Id*.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018) citing *Graham v. Connor*, 490 U. S. 386, 396 (1989). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain,

8

and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela*, 138 S. Ct. at 1152 (citing *Graham*, 490 U.S. at 396-397).

Plaintiff must identify "either 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (quoting *Ashcroft*, 563 U.S. at 741–42). "A plaintiff's failure to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment is often fatal to a claim outside of obvious cases." *K. W. P. v. Kansas City Public Schools*, 931 F.3d 813, 828 (8th Cir. 2019).

The undisputed facts establish that the officers were advised by dispatch that Powell was armed. When they arrived at the scene, Powell had his hands in his pockets when they arrived. Defendants ordered him to take his hands out of his pockets, and upon doing so, Defendants saw Powell with an eight inch knife. Powell held the knife in an overhand grip. Despite being ordered to drop the knife a combined total of six times, Powell did not comply. Powell quickly approached the officers yelling, continuing to hold the knife in an overhand grip. The video evidence establishes that although Powell turned and walked onto the embankment, he thereafter continued to approach the officers. Both officers have testified that they were in fear that Powell would stab Officer Shelton. At the point

9

where Powell was approximately six to eight feet from Officer Shelton, Officer Brown fired his weapon because he believed Powell was going to injure Officer Shelton. Likewise, Officer Shelton fired his weapon because he feared for his own safety as Powell approached him in what he believed to be an aggressive manner.

The Eighth Circuit Court of Appeals has very recently addressed the use of deadly force by police officers in circumstances similar to the instant matter. In *Sok Kong Tr. For Map Kong v. City of Burnsville*, 960 F.3d 985, (8th Cir. 2020), the Court held:

> Cases decided by this court after *Ludwig* make clear that, at the time of Kong's shooting, officers could use deadly force to stop a person armed with a bladed weapon if they reasonably believed the person could kill or seriously injure others. *See Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) (samurai sword); *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007) (machete); *Estate of Morgan v. Cook*, 686 F.3d 494, 498 (8th Cir. 2012) (knife). Though Kong appeared high on meth, the cases establish that mental illness or intoxication does not reduce the immediate and significant threat a suspect poses. *See, e.g., Hassan*, 489 F.3d at 919 (mental illness); *Estate of Morgan*, 686 F.3d at 498 (intoxication).

*Id*, at 993.

The video evidence here memorializes Powell's actions. He was seen pacing back and forth. When the officers approached him, he yelled, refused commands to drop the knife, and continued to quickly move toward the officers with the knife held in an overhand grip. These actions combined justify the officers' reasonable belief that Powell could kill or injure Officer Shelton.

Even if the officers caused Kong to leave his car by confronting him, they would reasonably believe the law allowed them to shoot him if he posed an immediate and significant threat. Even if officers "created the need to use" deadly force by trying to disarm a mentally ill person, the reasonableness of force depends on the threat the person poses during the shooting. *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995). In *Schulz*, a mentally ill man isolated himself in his parents' basement. *Id.* at 645. Although he initially presented no threat and had committed no crime, officers removed his hatchet and tried to subdue him. *Id.* at 646. The suspect attacked with an ax, forcing an officer to shoot him. *Id.* This court upheld exclusion of evidence that the officers "created the need to use force." *Id.* at 649.

Likewise, in *Hayek*, officers acted reasonably although their acts led a mentally ill man to attack them with a samurai sword. *Hayek*, 488 F.3d at 1054-55 (upholding qualified immunity for fatal shooting). Though Hayek had committed no crime, officers decided to remove him from his home because his mentally unstable behavior showed he might harm his mother, when she returned to the home. *Id.* at 1055. When he resisted being handcuffed, they chased him back into the home with a police dog. *Id.* at 1053. Hayek attacked an officer with a samurai sword, forcing the other officers to shoot him in response to his threatening and violent behavior. *Id.* at 1053, 1055.

In *Hassan*, officers tried to disarm a man walking down the middle of the street carrying a machete and a tire iron. *Hassan*, 489 F.3d at 917. He ignored repeated commands to drop his weapons. *Id.* Seeing pedestrians in the direction he was headed, an officer tased him twice. *Id.* Running into the parking lot of a strip mall, the man raised his machete toward an officer (although he obeyed commands to stop). *Id.* He moved toward officers despite being tased. *Id.* at 918. He continued to approach officers, making slashing motions with his machete and hitting a police car with it. *Id.* Officers shot him fatally. *Id.*

Based on *Schulz*, *Hayek*, and *Hassan*, a reasonable officer would have believed the law permitted shooting Kong. Like the officers in *Schulz* and *Hayek*, the Burnsville officers tried to disarm Kong to prevent him from causing harm, even if he initially posed no immediate threat to others. *See Schulz*, 44 F.3d at 646; *Hayek*, 488 F.3d at 1055. When Kong left his car, the threat he posed justified lethal force, even if officers caused him to leave his car. *See Hayek*, 488 F.3d at 1055. Like the man in *Hassan*, Kong's

11

unpredictable behavior with his weapon made him dangerous even if he had not yet harmed anyone. *See Hassan*, 489 F.3d at 919. *Cf. Swearingen v. Judd*, 930 F.3d 983, 988 (8th Cir. 2019) (holding that the law as of 2014 did not clearly establish a right when knife-wielding suspect posed threat of serious injury or death, even though he had not committed a violent crime against a person). Just as in *Hassan*, repeated commands and tasing did not cause Kong to drop his knife. *See Hassan*, 489 F.3d at 919. The encounter occurred in a McDonald's parking lot with citizens in the vicinity, like the strip mall parking lot in *Hassan*. *See id.* While *Hassan* involved pedestrians, the McDonald's parking lot had at least one pedestrian and several citizens in cars. *See id.* at 917.

The Trustee emphasizes that Kong, like Ludwig, may not have committed a violent felony. *See Ludwig*, 54 F.3d at 473-74; *Kisela*, 138 S. Ct. at 1152, *quoting Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (one factor for excessive force is "the severity of the crime at issue"). The district court found a material dispute of fact whether Kong committed a violent felony by shaking the knife in the car and moving the blade closer to officer Jacobs. *Kong*, 2018 WL 6591229, at *12. Viewing the facts most favorably to the Trustee, Kong did not commit a violent felony. *Id.*

However, 17 years after *Ludwig*, in *Estate of Morgan*, this court held that a knife-wielding man posed an immediate and significant threat even though he did not commit a violent felony. *See Estate of Morgan*, 686 F.3d at 497. Officers responded to a domestic disturbance at Morgan's house. *Id.* at 495. Morgan appeared intoxicated. *Id.* He stumbled on the porch, falling into a recliner, trying to conceal a kitchen knife by his side. *Id.* at 495-96. An officer pointed a gun at him from six to twelve feet away, ordering him repeatedly to drop the knife. *Id.* at 496. Morgan stood up, holding the knife pointed downward at his side. *Id.* He then raised his right leg as if to take a step in the officer's direction. *Id.* The officer shot him fatally. *Id.* This court held the officer acted reasonably because he had probable cause to believe Morgan posed a threat of imminent, substantial bodily injury. *Id.* at 497.

Like Morgan, Kong did not attack an officer with his knife before being shot. *See Kong*, 2018 WL 6591229, at *6 (assuming facts most favorably to Kong). Neither Morgan nor Kong threatened officers verbally. *See Estate of Morgan*, 686 F.3d at 495-96; *Kong*, 2018 WL 6591229, at *5–6. Both men appeared under the influence of a substance. *See Estate of Morgan*, 686 F.3d at 495; *Kong*, 2018 WL 6591229, at *3. Based on *Estate of Morgan*, a

12

>reasonable officer would have believed the law permitted shooting Kong even without a violent felony.
>
>Existing precedent of the Supreme Court and this circuit did not provide fair warning to the Burnsville officers that shooting Kong under these circumstances was unreasonable.

*Id*, at 993–95.  *See also, Dean Birkeland Tr. For John O. Birkeland*, 971 F.3d 787 (2020) (officers entitled to qualified immunity for use of deadly force on a knife wielding decedent).  Accordingly, Defendants are entitled to summary judgment on Count I of the First Amended Complaint alleging a violation of Decedent Powell's civil rights by using excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment.

**Official Immunity**

With respect to Plaintiff's wrongful death claim under Missouri State Law against Defendants Brown and Shelton, and the City of St. Louis, (Count IV), Defendants argue they are entitled to official immunity and sovereign immunity, respectively.

Under Missouri law, "public officials exercising discretionary duties, as opposed to ministerial duties, are entitled to official immunity from suit for 'all discretionary acts' unless the officials acted "in bad faith or with malice," which ordinarily requires 'actual intent to cause injury.' *State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443, 446–47 (Mo.1986) (en banc)." *Austell v. Sprenger*, 690 F.3d 929, 938 (8th Cir. 2012).  "[A] police officer's decision to use force in the performance

13

of his duties is discretionary rather than ministerial." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (citation omitted

But "official immunity does not apply to discretionary acts done in bad faith or with malice." *Id.* "Acting with malice requires an actual intent to cause injury." *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017) (citation omitted). "A finding of bad faith embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (citations omitted).

The record before the Court is completely devoid of any evidence that Officers Brown and Shelton acted with malice or bad faith. The officers were confronted with an agitated individual wielding a knife in an overhanded grip and moving quickly toward them. He failed to comply with their repeated orders to drop the weapon and continued his advance. Their actions in using deadly force in this instance are protected by official immunity.

**Sovereign Immunity**

"[I]n the absence of an express statutory exception to sovereign immunity, or a recognized common law exception such as the proprietary function and consent exceptions, sovereign immunity is the rule and applies to all suits against public entities[.]" *Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors,* 476 S.W.3d 913, 921-22 (Mo. 2016). Missouri law provides statutory exceptions to

14

sovereign immunity, including, as relevant here, when a political subdivision purchases liability insurance to cover certain tort claims, in the amount of and for the purposes covered by the insurance purchased. Mo. Rev. Stat. § 537.610.1; *see also Hammer v. City of Osage Beach*, 318 F.3d 832, 841 (8th Cir. 2003). "[A] plaintiff must specifically plead facts demonstrating that the claim is within this exception to sovereign immunity" by pleading the existence of insurance and that the insurance covers the plaintiff's claim. *Epps v. City of Pine Lawn*, 353 F.3d 588, 594 (8th Cir. 2003).

With regard to the state-law claim of wrongful death, Plaintiff has not pled that the City has waived sovereign immunity through its purchase of liability insurance, in accordance with the exception under § 537.610. Plaintiff, for the first time in her opposition to the second Motion for Summary Judgment claim the City has purchased insurance through the Public Facilities Protection Corporation, ("PFPC"). As such, Plaintiff has not disclosed any of her relied upon material for her argument that the City has waived sovereign immunity pursuant to Rule 26(a) of the Federal Rules of Civil Procedure. As such, Plaintiff is barred from using these materials to oppose summary judgment. Fed.R.Civ.P. 37(c)(1). Nothing in Plaintiff's First Amended Complaint nor her response to the motion for summary judgment provides evidence of a waiver of sovereign immunity as to her claim of wrongful death against the City of St. Louis.

## Conclusion

Based upon the foregoing analysis, Defendants are entitled to judgment as a matter of law under Rule 56.  The Motion for Summary Judgment will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 77], is **granted**.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 19th day of October, 2020.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE